935 A.2d 858

EDUCATION LAW CENTER, ON BEHALF OF ABBOTT V. BURKE, PLAINTIFF CHILDREN, PLAINTIFF–RESPONDENT v. NEW JERSEY DEPARTMENT OF EDUCATION, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 24, 2007—Decided December 11, 2007.

636

Before Judges WEFING, PARKER and R.B. COLEMAN.

*Nancy Kaplen,* Assistant Attorney General, argued the cause for appellant (*Anne Milgram,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Melissa T. Dutton,* Deputy Attorney General, on the brief).

*Koren L. Bell (Paul, Weiss, Rifkind, Wharton & Garrison)* of the New York bar, admitted pro hac vice, argued the cause for respondent (Education Law Center and *Ms. Bell,* attorneys; *Ms. Bell, Eric A. Stone, David Sciarra* and *Elizabeth Athos,* on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

Defendant, the New Jersey Department of Education ("the Department"), appeals from so much of the trial court's order of April 23, 2007, as directed it to release to plaintiff Education Law Center ("ELC") a certain document entitled "Alternative Funding Formula Simulations" which was prepared in October 2003 as an internal document of the Office of School Funding within the Department. Both parties have referred to this document as the "Simulation Memo," and we adopt that terminology for purposes

of this opinion. The Department argues that the Simulation Memo is not subject to disclosure either under the Open Public Records Act, *N.J.S.A.* 47:1A–1, or the common law. After reviewing the record in light of the contentions advanced on appeal, we reject these arguments and affirm.

Plaintiff ELC represents the plaintiff children in the on-going litigation involving the adequacy of school funding for the State's poorest school districts, conducted under the caption *Abbott v. Burke,* 100 *N.J.* 269, 495 *A.*2d 376 (1985) (Abbott I). The Department has been engaged for some time in the process of formulating recommendations to be submitted to the Legislature as part of proposed revisions to the manner in which funding is distributed among the more than six hundred school districts in the State, of which thirty-one are *Abbott* districts.[1]

In May 2006 ELC filed a request with the Department under the Open Public Records Act ("OPRA") seeking the release of the Department's records "related to the ... estimate, review and/or analyses of the cost of providing a thorough and efficient education undertaken by the Office of School Funding. . . ." In response to that request, the Department initially released more than nine hundred pages of documents, some of which had been partially redacted. Dissatisfied with the Department's response, ELC filed suit, alleging that the Department, by its redactions, had violated both OPRA and ELC's common law right of access to public documents.

ELC's filing of this complaint initiated extensive proceedings before the trial court, which issued a series of comprehensive, detailed letter opinions setting forth its findings and conclusions as to which portions of which documents should be released to ELC and which the Department could, at that juncture, properly withhold.

---

[1] In *Abbott II,* 119 *N.J.* 287, 394–97, 575 *A.*2d 359 (1990), the Supreme Court recognized twenty-nine school districts as special needs districts. Two more have been added by statute.

As we noted at the outset, this appeal focuses only upon one document out of the thousands that have been considered and released. A redacted copy of the Simulation Memo was released to ELC by the Department, and a copy of the Memo in that redacted form is included in the Department's appendix. In addition, the Department has provided a complete copy of the Memo to us in a confidential appendix, just as it provided a complete copy to the trial court for its in camera review. To the extent we refer to the body of this Memo within this opinion, we shall refer exclusively to the redacted version in recognition of the fact that the Department may seek further review of our determination.

The Memo is twelve pages in length and "outlines state aid simulation results for three funding formula structures." The redacted Memo identifies only one of the three structures, which it refers to as the State Share Percentage, defined as one wherein a district "receives a certain percent of the adequacy budget in the form of state aid based on their relative wealth." The following two paragraphs are redacted, as is the entire succeeding section, which contains nine bulleted items, all of which have been redacted and are identified only as "certain points [that] should be kept in mind." In its redacted version the Memo omits any description at all of the other two funding formula structures. If it were not for the introductory reference to three funding formula structures, the reader would be entirely unaware of the existence of any potential funding structure other than the State Share Percentage. The balance of the Memo in its redacted form consists primarily of various charts and tables purportedly addressing the cost and impact of the several structures. All substantive information has been redacted, however, from these charts and tables. The trial court ordered that the Memo be released in its entirety.

I

We shall first analyze the Department's claims under OPRA and then under the common law. In enacting OPRA, the Legislature

declared it to be the public policy of New Jersey that government records "be readily accessible for inspection, copying, or examination" and that "all government records shall be subject to public access unless exempt. . . ." *N.J.S.A.* 47:1A–1. The Department contends that the Memo does not fit within the parameters of OPRA's definition of a government record.

OPRA excludes from the definition of government records "inter-agency or intra-agency advisory, consultative, or deliberative material." *N.J.S.A.* 47:1A–1.1. The Department argues that the redacted portions of the Memo constitute "deliberative material" and are exempt from disclosure. It thus concludes that the trial court erred in ordering its release to ELC.

Before proceeding to analyze the particular document, we set forth certain general principles. In *In re Liq. of Integrity Insurance Co.*, 165 *N.J.* 75, 754 *A.*2d 1177 (2000), Justice Long, writing for the Court, noted that the deliberative process privilege is "rooted in the notion that the sovereign has an interest in protecting the integrity of its deliberations." 165 *N.J.* at 83, 754 *A.*2d 1177. The statutory deliberative material exemption contained within OPRA incorporates those principles. *Gannett N.J. Partners v. Middlesex*, 379 *N.J.Super.* 205, 219, 877 *A.*2d 330 (App.Div. 2005). It is "aimed at protecting the quality of government decisions by shielding the communications received by a decision maker from public disclosure." *Ibid.*

■ Two elements must be established in order for a government entity to be entitled to avail itself of OPRA's deliberative material exemption. "[T]he document must be predecisional, meaning it was 'generated before the adoption of an agency's policy or decision.'" *Ibid.* The Memo clearly fits within that initial category because the Department has not yet decided upon what school funding formula should be adopted.

■ That does not end the inquiry, however. The document must also "be deliberative in nature, containing opinions, recommendations, or advice about agency policies. . . . The privilege

does not extend to purely factual material that does not reflect deliberative processes." *Ibid.*

Finally, because the policy behind the statute is that citizens should have access to government records, a governmental entity which invokes the deliberative material exemption has the burden of establishing the exemption. *N.J.S.A.* 47:1A–6. ("The public agency shall have the burden of proving that the denial of access is authorized by law.") Thus, the Department has the burden of establishing that the Memo fits within the deliberative material exemption.

Having had the opportunity to review and study the Memo in its unredacted form, we are satisfied that the Department did not meet its burden, for the Memo does not satisfy the second prong of the exemption. In our judgment, the material at issue is numerical and statistical in nature. While the figures and calculations may illustrate different potential impacts of the differing funding structures, we cannot fairly categorize the redacted material as "containing opinions, recommendations or advice."

The Department argues that the formulation of the numerical and statistical material contained within the Simulation Memo is the product of judgments made by staff of the Department and is thus inherently deliberative. In support of its position, it points to *Quarles v. Dep't of the Navy*, 282 *U.S.App.D.C.* 183, 893 *F.*2d 390 (C.A.D.C.1990). Plaintiff in that case submitted a request under the Freedom of Information Act, 5 *U.S.C.A.* § 552, to obtain various studies prepared by the Navy in connection with its decision-making process with respect to selecting homeports for a battleship group to be formed. 893 *F.*2d at 391. Plaintiff was a reporter for a newspaper published in one of the sites ultimately rejected as a homeport. *Ibid.* The court ruled that cost estimates prepared by the Navy did not have to be disclosed in response to that request. *Id.* at 394. In the course of its decision, the court stated:

Numbers have a surface precision that may lead the unsophisticated to think of them as fixed, and of course some are—Waterloo *was* fought in 1815. But cost

estimates such as these are far from fixed, as anyone knows who has had two contractors bid on a home improvement or has compared budget estimates with final costs of a government project. They derive from a complex set of judgments—projecting needs, studying prior endeavors and assessing possible suppliers. They partake of just that elasticity that has persuaded courts to provide shelter for opinions generally.

[*Id.* at 392–93.]

We do not consider *Quarles* persuasive in the context of this matter. We perceive a significant distinction between the process of estimating construction costs over a period of years, for instance, and the statistical analyses contained within this by-now four-year-old memorandum.

II

We turn now to the question whether plaintiff was entitled to receive a copy of the Simulation Memo under the common law right to know. That the Legislature enacted OPRA did not abrogate a citizen's common law right to have access to public records. *Michelson v. Wyatt,* 379 *N.J.Super.* 611, 624, 880 *A.*2d 458 (App.Div.2005). "[N]othing contained in *L.* 1963, *c.* 73 (C.47:1A–1 et seq.), as amended and supplemented, shall be construed as affecting in any way the common law right of access to any record." *N.J.S.A.* 47:1A–1. The common law definition of what constitutes a "government record" is not coterminous with the OPRA definition, and in fact allows for a broader range of information to be released. *Higg–A–Rella Inc. v. Cty. of Essex,* 141 *N.J.* 35, 46, 660 *A.*2d 1163 (1995). "The common law right to inspect public records extends to a document made by a public employee in the exercise of the public business." *Michelson, supra,* 379 *N.J.Super.* at 624, 880 *A.*2d 458.

To prevail on a claim for access to documents under the common law right to know, a plaintiff must establish both an interest in the subject matter of the document and that a balance of factors weighs in favor of disclosure. *Higg–A–Rella, supra,* 141 *N.J.* at 46, 660 *A.*2d 1163.

Our courts have broadly interpreted the first prong, whether the plaintiff has an interest in the subject matter of the documents. In *Home News v. Dep't of Health*, the Supreme Court noted that a party's interest in the subject matter of the document need not be a personal one. 144 *N.J.* 446, 454, 677 *A.*2d 195 (1996). Further, the Court gave examples of qualifying interests, such as "a citizen's concern about a public problem." *Ibid.*

We have, in other cases, held that concerns for the integrity about the disbursement of public funds satisfies this prong. *Bergen Cty. Improvement Auth. v. North Jersey Media Group, Inc.*, 370 *N.J.Super.* 504, 522, 851 *A.*2d 731 (App.Div.), *certif. denied*, 182 *N.J.* 143, 861 *A.*2d 847 (2004); *Kuehne Chemical Co., Inc. v. North Jersey Dist. Water Supply Comm'n*, 300 *N.J.Super.* 433, 440–41, 693 *A.*2d 168 (App.Div.), *certif. denied*, 151 *N.J.* 466, 700 *A.*2d 878 (1997).

That this plaintiff's request for a copy of the Simulation Memo springs from a "concern about a public problem" would appear to be beyond question in light of its history of having been involved for decades in litigation on behalf of schoolchildren located in New Jersey's poorest districts. Plaintiff clearly satisfies this first aspect.

We turn now to the second prong. The Supreme Court has set out some of the factors a court should consider and weigh against one another in reaching a determination whether the document in question is subject to disclosure under the common law:

(1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.

[*Loigman v. Kimmelman*, 102 *N.J.* 98, 113, 505 *A*.2d 958 (1986).]

Of these factors, only the third and fourth bear at all upon the present question. As to the fourth listed factor, our earlier conclusion analyzing plaintiff's request under OPRA that the Simulation Memo is essentially factual in nature applies equally to our analysis of its request under its common law right to know. As to the third, the Department has not demonstrated that its decisionmaking ability will be chilled by disclosure.

The Court's recitation in *Loigman* of the appropriate factors to consider was intended, moreover, as illustrative, not definitive and exhaustive. *Id.* at 113, 505 *A*.2d 958. This flows from the inherent nature of the balancing process itself. "That the process be 'flexible and adaptable to different circumstances' is crucial to the correct application of the common-law right." *Bd. of Educ. Of Newark v. N.J. Dept. of Treasury*, 145 *N.J.* 269, 280, 678 *A*.2d 660 (1996) (upholding plaintiff's common law right to obtain information on medical claims paid by the State Health Benefits Plan on behalf of plaintiff's employees). In conducting that balancing process, a court should consider "whether the demand for inspection is 'premised upon a purpose which tends to advance or further a wholesome public interest or a legitimate private interest.'" *Loigman, supra*, 102 *N.J.* at 112, 505 *A*.2d 958.

The Department's argument against disclosure of the Simulation Memo at this point is, at bottom, a concern that it would stir controversy and discussion. That concern, however, should not, in our judgment, outweigh the benefit of a free and informed discussion of how to meet the pressing public need for adequate funding for our State's schools. The desire to withhold the document at this time bespeaks a lack of confidence in the ability of our citizens to digest and analyze the potential consequences of the choices this State must make. We decline to adopt such a posture.

The order under review is affirmed.